[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
Before the Court is a petition by Richard Morin (hereinafter "defendant") seeking his release from the Department of Mental Health, Retardation, and Hospitals (hereinafter "M.H.R.H") pursuant to R.I.G.L. 1956 (1990 Reenactment) §40.1-5.3-3(f)(5). The State of Rhode Island (hereinafter "the State") objects to the granting of defendant's release.
Statement of Facts
The facts giving rise to this petition involve a seemingly innocuous traffic accident which turned to tragedy and which occurred on Diamond Hill Road in the Town of Cumberland, Rhode Island. The events giving rise to defendant's charges follow.
On November 7, 1982, at approximately 12:46 a.m., defendant was involved in an auto accident in which defendant's auto allegedly struck an auto driven by Mark Sawaia. Mr. Sawaia was the operator of his vehicle in which his girlfriend, Susan Olivier, was also riding. A passenger in defendant's auto, Diane Cleveland, had initially told the Cumberland police officers who responded to the scene that she was the operator at the time of the accident. However, after some initial confusion at the scene, it was determined that defendant had been the operator of his vehicle.
Immediately after the collision, both Sawaia and Ms. Olivier, neither of whom sustained any injuries, alighted from their vehicle to await the arrival of police. Passenger Cleveland, who did sustain injuries, was seated, dazed, in the front seat of defendant's auto.
Patrolman Shawn O'Connor was the first officer on the scene. He was "backed up" by Patrolman Dennis Malloy and Patrolwoman Lori Cronshaw. Several other officers also responded to the scene. After an initial investigation by O'Connor, it was determined that defendant was the operator of the vehicle. The officers had probable cause to believe that defendant was intoxicated. They then approached defendant in order to advise him of his constitutional rights.
As Officers O'Connor, Malloy, and Howard Sheats began to escort defendant towards a police cruiser, defendant abruptly stopped. It was at this time that defendant allegedly pushed Sheats to the ground. Almost simultaneously, defendant allegedly pulled a gun from his waist area, pointed it at O'Connor's face, and fired. O'Connor was struck in the face as well as the left wrist area. Defendant then allegedly turned towards Malloy and fired a single shot striking Malloy in the left side. The officers then naturally sought cover from further shots.
When the first shot was fired, Sawaia grabbed Ms. Olivier and both sought refuge behind an auto. While they were crouched behind the rear of the vehicle, defendant approached. Then, at a short distance away defendant allegedly assumed a military-like assault stance, pointed his gun at Ms. Olivier, and fired two (2) shots. Both shots struck Ms. Olivier in the head. She later died as a result of the injuries.
Defendant then allegedly observed Officer Malloy who had sought cover behind a vehicle. Defendant then began to approach Malloy with his gun still in his hands. At this point, Officer Malloy, though wounded, was miraculously able to remove his service revolver. Malloy fired one shot which struck defendant in the head.
As a result of this exchange of gunfire, defendant was charged with numerous offenses the most serious of which were murdering Ms. Olivier and two counts of assault with intent to murder the two officers who were shot.
Defendant sustained serious and debilitating injuries as a result of the gunshot wound to the head. For some time after the shooting, defendant was comatose. Thereafter, defendant was diagnosed as suffering from paralysis to his right side as well as a severe case of aphasia — which is a term used to describe that condition which prevents a person from comprehending words. Defendant has since made substantial progress in his rehabilitation, yet he remains afflicted with aphasia.
Initially, defendant was determined to be a parole violator and was remanded to the Adult Correctional Institute to serve the remainder of his sentence. In 1987, after having completed his sentence, defendant was ordered held at the Zambarano Hospital pursuant to R.I.G.L. 1956 (1984 Reenactment) § 40.1-5.3-3(f). Said statute allows a defendant who is found incompetent to stand trial to be committed to a state institution. Defendant was then transferred, in 1989, to the Institute of Mental Health's Forensic Unit, where defendant is presently institutionalized.
Pursuant to R.I.G.L. 1956 (1990 Reenactment) §40.1-5.3-3(h), the Court has held periodic reviews of defendant's competency to stand trial. During the period of defendant's institutionalization numerous physicians have examined defendant in order to determine whether the brain damage which defendant suffered as a result of the shooting has left him incompetent to stand trial. This question has consistently been answered in the affirmative.
Defendant was most recently examined in August and October of 1991. The conclusive result of these examinations was that defendant is still incompetent to stand trial. Furthermore, it has been determined that defendant's recovery has plateaued and the prognosis of defendant ever attaining a level of competency sufficient to stand trial is remote.
Defendant has petitioned this Court for his release from M.H.R.H. pursuant to R.I.G.L. 1956 (1990 Reenactment) §40.1-5.3-3(f)(5). Said statute empowers the Court to command such a release where the Court finds that there is no reasonable likelihood that in the foreseeable future the defendant will become competent and where said defendant is not civilly committable.
While the State concurs that defendant's competency level would not allow him to effectively assist in a conventional trial, the State's position is that defendant is "conditionally competent" and, as such, should be brought to trial.
Analysis
This is a case of first impression in this state. At issue is whether the statute upon which defendant relies mandates his release from M.H.R.H. If the answer to that question is in the affirmative, the Court's function is to carry out that which our legislature intended while keeping an ever vigilant eye towards those constitutional rights which all persons are guaranteed. While the particular statute in question has not yet been interpreted in this State, the Court's task is facilitated by a careful analysis of the statute as well as a diligent study of similar statutes from other jurisdictions.
The Competency Statute
The statute upon which defendant relies is R.I.G.L. 1956 (1990 Reenactment) § 40.1-5.3-3. Said statute is entitled "Competency to Stand Trial" and it provides for certain mechanisms which the court must adhere to when a person's competency to stand trial is called into question. Specifically, the statute defines when a person is and is not competent to stand trial. A defendant is incompetent to stand trial if "he or she is unable to understand the character and consequences of the proceedings against him or her or is unable properly to assist in his or her defense." R.I.G.L. 1956 (1990 Reenactment) §40.1-5.3-3(a)(3).
Where, in the Court's opinion, a question arises as to whether a defendant's competency is at issue the court may order the defendant to undergo an examination. R.I.G.L. 1956 (1990 Reenactment) § 40.1-5.3-3(b). Once the examination is complete a hearing is mandated at which time the court determines whether the defendant is competent to stand trial. If the court finds that the defendant is incompetent to stand trial, it is authorized to commit the defendant to an appropriate public or private facility. R.I.G.L. 1956 (1990 Reenactment) §40.1-5.3-3(f).
This commitment is not permanent, however, as the General Assembly provided for five (5) instances wherein a defendant's release is mandated — one of which is immediately applicable. Where a defendant is committed pursuant to subsection (f), and where, upon periodic review of the defendant's competency, the court determines that there is "no reasonable likelihood that in the foreseeable future the defendant will become competent . . ." the defendant must be released if civil commitment is not warranted. R.I.G.L. 1956 (1990 Reenactment) § 40.1-5.3-3(f)(5).
In the case sub judice, defendant sustained serious and debilitating injuries as a result of a bullet wound to the head. After initially serving a sentence as a parole violator, defendant was committed to Zambarano Hospital pursuant to the aforementioned statute. The Court has subsequently held periodic reviews to determine whether or not defendant's competency had improved to a level which would allow him to stand trial.
In May, 1991, defendant filed the present petition seeking his release. A scheduled hearing was held on December 12, 1991. At this hearing the Court heard expert testimony concerning defendant's level of competency to stand trial. The testimony adduced at said hearing was consistent with that of the previous competency hearings in that defendant was still found to be incompetent to stand trial. For purposes of clarity, it is necessary for the Court to detail the testimony given at the December 12, 1991, hearing.
Defendant was examined by Dr. Jeffrey Wishik, M.D., who is a board certified neurologist and who was qualified as an expert in the field of language disorders and aphasia. Dr. Wishik examined defendant on August 22, 1991. Dr. Wishik opined that based upon previous medical reports defendant had shown considerable improvement in his physical and mental functioning, yet the impairment in his cognitive abilities rendered him incapable of assisting in his defense.
Dr. Wishik's examination consisted of what to the ordinary and competent person would come easily. For example, defendant was unable to repeat even two (2) digits in reverse order — nor was he able to spell out loud the word "world." Defendant was also unable to form a sentence of more than four or five words. During most of the examination Dr. Wishik was required to speak slower than normal and was sometimes required to repeat commands. Dr. Wishik also testified that when he spoke at a normal rate of speed defendant "loses the thread of the conversation."
Dr. Wishik's diagnosis was that defendant has significant impairments in attention, concentration, and language function — especially verbal output. Defendant also suffers impairment in memory functioning. In Dr. Wishik's opinion defendant's language deficits would greatly hamper his ability to assist in his defense. Furthermore, Dr. Wishik opined that based upon his examination of defendant it would be "impossible for him to participate meaningfully in a courtroom proceeding."
Defendant was also examined on two (2) occasions by Dr. Thomas J. Guilmette, Ph.D. These examinations took place on October 8 and October 22, 1991, and were requested by the State. Dr. Guilmette was also qualified as an expert in the field of neurology and on both occasions conducted a neuropsychological examination of defendant.
Dr. Guilmette conducted several neurological tests of defendant aimed at determining defendant's competency level. It was Dr. Guilmette's opinion that defendant's ability to "adequately assist in his defense depended upon how much he needs to understand in a courtroom setting." Dr. Guilmette further opined that as the pace of a normal trial quickened defendant's ability to comprehend the nature of the proceedings would undoubtedly be compromised. As a result, in Dr. Guilmette's opinion, defendant would be able to understand less than half, and perhaps as little as 20 to 30%, of what was transpiring.
In this respect, Dr. Guilmette posited that if the courtroom proceedings were conducted in a slower and simpler manner, and if the Court proceedings were reviewed with defendant after they had occurred, defendant would be assured of comprehension. Further, all testimony would have to be reduced to shorter, simpler phrases. Dr. Guilmette concluded that due to the complex nature of the issues he was unable to definitively state whether defendant was or was not competent to stand trial.
COURT'S DETERMINATION OF INCOMPETENCY
At the outset, and based upon the medical testimony adduced at the December 12, 1991, hearing, the Court is required to determine whether defendant is competent to stand trial. It appears clear that based upon the statutory definition of "incompetency," or, in the alternative, the definition of "competency," defendant lacks the necessary capability to properly understand the character and consequences of the proceedings against him and is otherwise unable to properly assist in his defense. R.I.G.L. 1956 (1990 Reenactment) §40.1-5.3-3(a)(2) and (a)(3). The Court finds, therefore, that defendant is presently incompetent to stand trial.
Having found that defendant is presently incompetent to stand trial the Court is next required to determine whether defendant's continued commitment is either statutorily or, more importantly, constitutionally permissible.
Pursuant to subsection (f)(5) of the statute in question, the Court is required to order defendant's release should it find that defendant is not likely to become competent in the reasonable foreseeable future. Although defendant would then be subject to civil commitment, said commitment would be subject to the provisions of R.I.G.L. 1956 (1990 Reenactment) § 40.1-5-8.
With respect to defendant's prognosis for attaining a level of competency which would allow him to properly assist in his defense, the Court is mindful that defendant has consistently been found to be incompetent based upon neurological examinations conducted over the last seven (7) years. Furthermore, and significantly, defendant's condition was found to have plateaued during an examination conducted by Dr. David Askew, Ph.D., and Dr. Ronald Stewart, M.D. on or near October 29, 1990. It is fair to say, then, that any hope of defendant attaining the necessary competency level to stand trial is slim at best. As such, it is not likely that defendant will "in the reasonable and foreseeable future" become competent. Consequently, the Court is mandated pursuant to subsection (f)(5) to release defendant or seek civil commitment.
Defendant Not Civilly Committable
Pursuant to the Rhode Island civil commitment statute a person who is alleged to be in need of care and treatment in a facility may be civilly committed to such a facility where the person's presence in the community would create a serious harm by reason of a mental disorder. R.I.G.L. 1956 (1990 Reenactment) §40.1-5-8(1). It is important to note that defendant's condition is not a result of a mental disorder. A mental disorder is a condition wherein the capacity of a person to exercise self control or judgment is seriously impaired. See, R.I.G.L. 1956 (1990 Reenactment) § 40.1-5-2(13).
The examinations of Drs. Wishik and Guilmette concluded that defendant's condition was a direct result of the bullet wound sustained in the exchange of gunfire with the Cumberland Police. Defendant was not found to be suffering from a mental disorder. Furthermore, there is no indication that defendant would further benefit from treatment if he were to remain confined to the Forensic Unit of M.H.R.H. As such, this Court finds that defendant is not civilly committable pursuant to the aforementioned statute.
The Court is thus faced with what many in the community will view as a grave injustice — that is, releasing a defendant who was charged with some of the most serious crimes imaginable. However, it is imperative to understand that a defendant who stands accused of even the most detestable crimes nevertheless enjoys many of the same constitutional rights as does a law abiding citizen.
Due Process Commands Release
At the very heart of requiring a defendant to be competent to stand trial is that the defendant be able to communicate to his or her attorney those facts which could result in an innocent verdict. Absent this ability a manifest injustice would almost seem certain. As the United States Supreme Court has stated,
. . . [I]t is not enough . . . that the defendant is oriented to time and place and has some recollection of events, . . . the test must be whether he has sufficient ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational understanding of the proceedings against him.
Dusky v. United States, 362 U.S. 402. See, also, Note,Incompetency to Stand Trial, 81 Harv. L. Rev. 454 (1967).
Where a state's legitimate interest in bringing an accused to trial clashes with an incompetent defendant's constitutional rights, courts are faced with a trilemma. In the first instance, should the incompetent defendant nevertheless be brought to trial a violation of due process is almost assured. If, however, the defendant is committed to an institution until such time that he is competent to stand trial, the commitment could theoretically be tantamount to a life sentence. It is axiomatic that either alternative is constitutionally impermissible. See, State v.Raitz, 621 P.2d 352, 356 (Hawaii 1980).
Against defendant's constitutional argument the Court must balance the right of society to bring the accused to trial and to be protected from future criminal acts committed by the defendant. Id. While at first glance this basic societal right would seem to take precedence over defendant's constitutional claims, an understanding of the severity of defendant's injuries dismisses this fear.
Defendant's present condition renders him incapable of almost all normal activity. His speech, eyesight, ability to communicate, physical movement, and ability to concentrate have all been seriously impaired as a result of the shooting. Presently, defendant is a fraction of the man he once was. In his present condition, it is highly unlikely that defendant would ever again pose a threat to society.
Moreover, the present case is controlled by the United States Supreme Court's holding in Jackson v. Indiana, 406 U.S. 715
(1972). In Jackson, the defendant was a deaf mute who was unable to read, write, or otherwise effectively communicate. He was charged with two (2) criminal offenses, found to be incompetent to stand trial, and committed pursuant to an Indiana statute which permitted such a pre-trial commitment.
The court held that involuntary commitment until such time that the defendant was competent to stand trial was a violation of equal protection and due process. Id. Such a commitment, the court posited, was tantamount to a "life sentence" without the defendant ever having been convicted. Id.
As to equal protection, the court in Jackson held that but for the pending criminal charges against the defendant, the state would have been required to commit the defendant pursuant to a civil commitment statute which required a higher threshhold of commitment standard than did the commitment for an incompetent defendant. In effect, the state was condemning the defendant to permanent institutionalization and in the process denying the defendant equal protection of the laws. Jackson, 406 U.S. at 730.
With respect to due process, the Jackson court posited that confining an accused indefinitely pending trial and whose release was conditioned solely upon attainment of competence decried both policy and constitutional grounds. Jackson, 406 U.S. at 734. Specifically, the court held
. . . [A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than a reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding . . . or release the defendant."
Jackson, 406 U.S. at 738.
Shortly after the court's holding in Jackson our General Assembly made substantial changes to the Rhode Island competency statute which resulted in the present statute upon which defendant relies in seeking his release. The defendant's release from M.H.R.H., therefore, is both statutorily authorized and constitutionally mandated. It is noteworthy that in Jackson the defendant had been committed for a period of three and one-half years prior to being released pursuant to the court's decision. In the present case, defendant has been confined due to his incompetency to stand trial for nearly four and one-half years, excluding the term served as a parole violator.
Conditional Competency Not Recognized
The State does not directly question defendant's incompetency to stand trial. Rather, the State asserts that based upon Dr. Guilmette's examination defendant is "conditionally competent" and should therefore be brought to trial. The Court, after an exhaustive search, has not found, nor has the State offered, any precedent for applying the State's theory that a defendant who is "conditionally competent" may nevertheless be brought to trial.[1]
Requiring a defendant to be competent to stand trial assures the defendant that his or her Sixth Amendment right to a fair trial is guaranteed. Furthermore, where a defendant is incapable of effectively communicating with counsel, testifying in his or her own behalf, or accurately confronting witnesses against him or her, such basic constitutional rights are gravely limited. See, Note, Incompetency to Stand Trial, 81 Harv. L. Rev. 454 (1967). A defendant must, at the very least, be able to intelligently and cognitively communicate all relevant information necessary for his or her defense.
In the present case, defendant has been examined on numerous occasions. On each occasion the defendant's incompetency to stand trial has consistently been found. The reports indicate that due to defendant's lack of communicative skills and language deficits he would be unable to assist in his defense. The Court concurs. Any deviation from requiring a defendant to be "wholly" competent to stand trial would fly in the face of fundamental fairness. Accordingly, the Court rejects the State's contention that defendant's "conditional competency" would allow him to effectively exercise his constitutionally guaranteed rights.
The State also argues that a trial court is vested with broad discretion in the conduct of a trial, and, as such, should allow defendant to be brought to trial based upon his "conditional competency." Such discretion is nevertheless subject to compliance with statutory or constitutional requirements. Statev. Robertson, 102 R.I. 623, 232 A.2d 781 (1967). Clearly, the statutory and constitutional constraints previously articulated prevent the Court from deviating therefrom.
Dismissal of Defendant's Charges
Defendant next moves the Court to dismiss all charges pending against him. Defendant avers that where a person is found to be incompetent to stand trial and is subsequently released pursuant to § 40.1-5.3-3(f)(5) the Court is without authority to assert any further jurisdiction over said person with respect to the pending charges. Defendant's contention is a valid one. See,Jackson, 406 U.S. at 739.
Our legislature has provided that a defendant who is incompetent to stand trial and who will not, in the reasonable foreseeable future, become competent must be released. R.I.G.L.
1956 (1990 Reenactment) § 40.1-5.3-3(f)(5). Once released, and for all practical purposes, the court loses jurisdiction over the defendant as the legislature failed to provide for any mechanism which would have allowed the court to maintain jurisdiction. Indeed, a result to the contrary could very well result in defendant's constitutional rights being violated. See, Id.,Klopfer v. North Carolina, 386 U.S. 213 (1967).
The court in Jackson declined to dismiss the defendant's charges. However, the decision not to dismiss was premised upon the fact that the state therein had not yet addressed this particular issue. The court did posit, however, that the defendant's claim that the charges ought to be dismissed was a "substantial one" based upon several constitutional grounds.Jackson, 406 U.S. at 739-40.
The State herein is without either statutory or constitutional authority to maintain the charges over defendant indefinitely once he has been released pursuant to §40.1-5.3-3(f)(5). Where a defendant is so released the court has abandoned any hope that his or her competency level will improve. In a sense, the pending criminal charges are then left suspended over the incompetent defendant. With no hope of ever bringing the incompetent defendant back before the court, these charges should be dismissed.
For the reasons herein above set out the Court grants defendant's petition for release from M.H.R.H. pursuant toR.I.G.L. 1956 (1990 Reenactment) § 40.1-5.3-3(f)(5). The Court further orders that all charges pending against defendant as a result of the November 7, 1982 incident be dismissed. Pursuant toR.I.G.L. 1956 (1990 Reenactment) § 40.1-5.3-3(j) the Court is mandated to stay such an order for release for a period of thirty (30) days. Accordingly, the defendant's release and the dismissal of charges is hereby stayed for thirty (30) days.
Counsel shall prepare the appropriate judgment for entry.
[1] The State does cite one case. However, a careful reading of the case discloses that at no time did the court adopt a "conditional competency" standard. The defendant therein was brought to trial based upon the defendant being found competent to stand trial. See, Kendrick v. State, 646 S.W.2d 663, (Tex. App. 1 Dist. 1983).